

FILED

MAR 2 4 2017

U.S. COURT OF
FEDERAL CLAIMS



# In the United States Court of Federal Claims

No. 16-264C
(Filed Under Seal: January 31, 2017)
(Reissued for Publication: March 24, 2017)[*]

**************************************

| | |
|---|---|
| CARL PARKER, Individual and Administrator for the Estate of Gary L. Parker,  *  *  *  * | |
| Plaintiff,  * | RCFC 12(b)(1); RCFC 12(b)(6); Subject Matter Jurisdiction; Failure to State a Claim Upon Which Relief Can Be Granted; Pigford Litigation; Section 741; Consent Decree; Equal Credit Opportunity Act; Contractual Takings; Unenacted Legislation; 2008 Farm Bill |
| v.  * | |
| THE UNITED STATES,  * | |
| Defendant.  * | |

**************************************

Carl Parker, Ashburn, GA, pro se.

Daniel S. Herzfeld, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

In this case, plaintiff Carl Parker, individually and as administrator for the estate of Gary L. Parker, seeks damages related to (1) the purported failure of the Farm Service Agency ("FSA") of the United States Department of Agriculture ("USDA") to abide by the consent decree in the Pigford class-action discrimination litigation and (2) ongoing discrimination by the USDA. Defendant United States moves to dismiss the complaint for lack of subject matter jurisdiction and, alternatively, for failure to state a claim upon which this court can grant relief. For the reasons set forth below, the court grants defendant's motion to dismiss and denies Carl Parker's motion for summary judgment as moot.

---

[*] The court provided the parties with an opportunity to suggest redactions to this ruling. In a February 28, 2017 status report, defendant indicated that no redactions were necessary and that it had been unsuccessful in attempting to communicate with Carl Parker regarding proposed redactions. To date, Carl Parker has not suggested any redactions. Accordingly, the court reissues this decision without redactions.

# I. BACKGROUND

## A. <u>Pigford I</u> Litigation

On August 28, 1997, three African-American farmers filed a putative class action against the USDA to obtain redress for a long pattern of discrimination against African-American farmers in its credit and benefit programs.[1] <u>Pigford v. Glickman</u> ("<u>Pigford I</u>"), 185 F.R.D. 82, 86-89 (D.D.C. 1999), <u>aff'd</u>, 206 F.3d 1212 (D.C. Cir. 2000). Although the USDA had a process in place for resolving discrimination complaints, the system had been effectively nonexistent for over a decade prior to initiation of the lawsuit, leaving many wronged farmers without relief. <u>Id.</u> at 88. This systemic discrimination, which violated the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f (2012), led to a significant decline in the number of African-American farmers throughout the United States. <u>Pigford I</u>, 185 F.R.D. at 87. An initial class was certified on October 9, 1998. <u>Id.</u> at 90.

Prior to 2010, the statute of limitations on alleged ECOA violations was two years. 15 U.S.C. § 1691e(f) (2006); <u>see</u> Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1085(7), 124 Stat. 2083, 2085 (2010) (increasing the statute of limitations on ECOA claims from two years to five years). On October 21, 1998, Congress enacted the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act of 1999, Pub. L. No. 105-277, div. A, sec. 101(a), 112 Stat. 2681, 2681 to 2681-50 (1998). Section 741 of that Act ("Section 741") waived the statute of limitations for actions filed within two years of its passage—i.e., until October 21, 2000—if a complaint had been filed with the USDA before July 1, 1997, alleging nonemployment discrimination between January 1, 1981, and December 31, 1996. <u>Id.</u> § 741, 112 Stat. at 2681-30 to -31. Section 741 also permitted aggrieved farmers to obtain an administrative hearing on the record in lieu of pursuing a judicial remedy. <u>Id.</u>

On January 5, 1999, a newly certified class in <u>Pigford I</u> was defined as:

> All African American farmers who (1) farmed, or attempted to farm, between January 1, 1981 and December 31, 1996; (2) applied to the United States Department of Agriculture (USDA) during that time period for participation in a federal farm credit or benefit program and who believed that they were discriminated against on the basis of race in USDA's response to that application; and (3) filed a discrimination complaint on or before July 1, 1997, regarding USDA's treatment of such farm credit or benefit application.

---

[1] The court derives the facts in this section from Carl Parker's complaint ("Compl."), the exhibits attached to the complaint ("Compl. Ex."), the appendix to defendant's motion to dismiss ("Def.'s App."), the attachments to defendant's reply in support of its motion to dismiss ("Def.'s Reply Attach."), filings in related litigation, and various judicial and administrative decisions.

185 F.R.D. at 92. Following settlement negotiations, id. at 89-92, a consent decree was approved as "fair, adequate, and reasonable" on April 14, 1999, id. at 86.[2] Its purpose was to ensure that "in their dealings with USDA, all class members receive full and fair treatment that is the same as the treatment accorded to similarly situated white persons." Def.'s App. A2. The estimated value of the settlement at the time was $2.25 billion, constituting the "largest civil rights settlement in the history of this country." Pigford I, 185 F.R.D. at 95.

Under the terms of the consent decree, class members could opt out of class treatment within 120 days of entry of the consent decree. Def.'s App. A5. Otherwise, class members were generally required to submit a claim package within 180 days of entry of the consent decree—i.e, by October 12, 1999—demonstrating class membership and electing to proceed under one of two tracks. Id. at A8-10. Class members missing this deadline who could demonstrate that their late filing was due to "extraordinary circumstances beyond [their] control" were allowed to file late petitions. In re Black Farmers Discrimination Litig. ("Pigford II"), 856 F. Supp. 2d 1, 11 (D.D.C. 2011) (internal quotation marks omitted), appeal dismissed sub nom. Latham v. Vilsack, Nos. 11-5326, 11-5334, 12-5019, 2012 WL 10236550 (D.C. Cir. July 25, 2012). Such relief was extremely limited and did not extend to those who "had only recently learned" of the consent decree; out of the 61,252 would-be class members who sought to file late claims, only 2,585 were allowed to do so.[3] Id. Including both timely submitted claims and late claims, over 22,700 claim packages were submitted by "individuals eligible to pursue relief under the terms of the consent decree." Id.

The choice between the two tracks carried "enormous significance. Under Track A, the class member [had] a fairly low burden of proof but his recovery [was] limited. Under Track B, there [was] a higher burden of proof but the recovery [was] unlimited."[4] Pigford I, 185 F.R.D. at 96. Once made, the choice of which track to pursue was binding; in other words, dissatisfied Track B claimants could not then proceed under Track A. Id. at 107.

Farmers proceeding under Track A were required to show racial discrimination under a "substantial evidence" standard. Def.'s App. A13; see also id. at A4 (defining "substantial evidence"). Relief available to farmers choosing to proceed under Track A was limited to (1) a

---

[2] The consent decree is reproduced in its entirety in defendant's appendix at pages A1 to A29. It can also be found on the docket of Pigford I at ECF No. 167.

[3] The 61,252 figure does not include those who failed to submit a petition to file a late claim by the deadline for doing so. Pigford II, 856 F. Supp. 2d at 11. There were as many as 25,000 of these "late-late" possible class members whose requests to file a late claim were not considered. Id.

[4] The overwhelming majority of claimants chose to proceed under Track A. Pigford v. Veneman, 292 F.3d 918, 921 (D.C. Cir. 2002); Pigford II, 856 F Supp. 2d at 11. Only 170 claimants sought Track B relief. Pigford II, 856 F. Supp. 2d at 11. Overall, "approximately 16,000" claimants were successful in obtaining "direct payments, loan forgiveness, and tax relief." Id.; see also id. at 17 (noting that the aggregate payout to successful claimants was over $1 billion).

one-time $50,000 cash payment, (2) discharge of all outstanding debts to the USDA that were the "subject of the ECOA claim(s) resolved in the class member's favor by the adjudicator," (3) an additional tax offset payment made directly to the Internal Revenue Service of twenty-five percent of the sums expended for the one-time payout and debt relief, (4) termination of foreclosure proceedings against real property "in connection with the ECOA claim(s) resolved in the class member's favor by the adjudicator," and (5) injunctive relief including one-time priority loan consideration and technical assistance. Id. at A14, A19-20; accord Pigford I, 185 F.R.D. at 97. An adjudicator's decision under Track A was not subject to "review in any court or before any tribunal . . . with respect to any claim that [was], or could have been decided by the adjudicator." Def.'s App. A16; accord Pigford I, 185 F.R.D. at 97.

Farmers electing to proceed under Track B were provided a full-day evidentiary hearing before an arbitrator, who would determine whether there had been racial discrimination under a higher "preponderance of the evidence" standard. Def.'s App. A18; accord Pigford I, 185 F.R.D. at 97; see also Def.'s App. A4 (defining "preponderance of the evidence"). The same injunctive relief that was available under Track A was also available under Track B, but under Track B, the monetary damages were unlimited, encompassing debt relief, "actual damages" available under the ECOA, and the additional tax offset payment. Pigford I, 185 F.R.D. at 97; Def.'s App. A18. Like an adjudicator's decision for Track A claimants, an arbitrator's decision for Track B claimants was not subject to "review in any court or before any tribunal . . . with respect to any claim that [was], or could have been decided, by the arbitrator." Def.'s App. A19; accord Pigford I, 185 F.R.D. at 97.

Generally speaking, debts incurred between January 1, 1981, and December 31, 1996, that were "affected" by discrimination could be discharged under the consent decree. Pigford I, 185 F.R.D. at 97; Def.'s App. A14, A18; Compl. Ex. A at 2. The date of discrimination and the type of loan were important findings. Compl. Ex. A at 2. Loans issued under the same program—such as the farm operating loan program or the farm ownership loan program—are considered the same type.[5] Id. When a particular loan was found to have been affected by discrimination, additional debt of the same type as the affected loan was also eligible for discharge if (1) it was incurred at the same time as or later than the affected loan and (2) the original application for the additional debt had been filed by December 31, 1996. Id. at 2-3. Later rescheduling of a particular loan would not alter its inception date. Id. at 3; see also Pigford v. Schafer, 536 F. Supp. 2d 1, 10-12 (D.D.C. 2008) (interpreting "incur" as the loan origination date irrespective of any later rescheduling).

A dissatisfied claimant under either Track A or Track B could ask the court-appointed monitor to direct the adjudicator or arbitrator to "reexamine a claim where the Monitor determines that a clear and manifest error has occurred in the screening, adjudication, or arbitration of the claim . . . ." Def.'s App. A21; accord Pigford I, 185 F.R.D. at 97, 107-08. No other appeals were available to claimants. Pigford I, 185 F.R.D. at 97, 107-08; Def.'s App. A16,

---

[5] The farm operating and farm ownership loan programs are two separate programs among the various agricultural credit programs overseen by the FSA. Compl. Ex. A at 2; see also 7 U.S.C. § 6932(b) (2012).

A19.  Additionally, the USDA had no right to appeal decisions of either adjudicators or arbitrators.  Pigford I, 185 F.R.D. at 108.  The court-appointed monitor was also available to provide assistance in the event the consent decree was alleged to have been violated.  Id. at 98.

The United States District Court for the District of Columbia ("DC district court") retained jurisdiction to enforce the consent decree.[6]  Pigford I, 185 F.R.D. at 98; Def.'s App. A22, A27; see also Pigford, 206 F.3d at 1218-19 (discussing the DC district court's powers to enforce the decree through contempt proceedings or modification of the consent decree); Def.'s App. A13 (outlining steps that must be taken prior to seeking a court order).  A July 14, 2000 stipulation and order clarified the review process "by establishing a framework for deadlines by which all Petitions would have to be submitted to the Monitor."  Pigford v. Glickman, Nos. 97-1978, 98-1693, 2000 WL 34292618, at *1 (D.D.C. Nov. 8, 2000).  Claimants were given 120 days to seek monitor review of an adverse decision on Track A or Track B claims.  Id. at *1 n.1.  Although some flexibility regarding the deadline was provided, those who did not meet the deadline were ultimately denied further review by the monitor.  Pigford v. Johanns, 416 F.3d 12, 14-15 (D.C. Cir. 2005).

On November 2, 2015, the DC district court entered a wind-down stipulation and order terminating the stipulations of the consent decree, with limited exceptions.  Def.'s App. A30-37.  The exceptions relevant to this case are those providing that (1) paragraph 9(a)(iii)(A) of the consent decree is still valid, and (2) the DC district court retains jurisdiction to enforce the wind-down stipulation and order and the remaining provisions of the consent decree.  Id. at A32, A36.  Paragraph 9(a)(iii)(A) of the consent decree provides that:

> USDA shall discharge all of the class member's outstanding debt
> to USDA that was incurred under, or affected by, the program(s)
> that was/were the subject of the ECOA claim(s) resolved in the
> class member's favor by the adjudicator.  The discharge of such
> outstanding debt shall not adversely affect the claimant's eligibility
> for future participation in any USDA loan or loan servicing
> program.

Id. at A14.  In other words, the USDA was not relieved of its obligation to discharge affected debt or its obligation to ensure that such discharge did not negatively impact farmers applying for loans in the future.

## B.  Pigford II Litigation

In 2008, Congress "resurrected the claims of those who had unsuccessfully petitioned the Arbitrator for permission to submit late claim packages" following "extensive hearings on the Pigford [I] case and the consent decree."  Pigford II, 856 F. Supp. 2d at 11.  The Food, Conservation, and Energy Act of 2008 ("2008 Farm Bill") recognized that "all pending claims and class actions brought against the Department of Agriculture . . . based on racial, ethnic, or

---

[6]  To date, there have been nearly 2,000 docket entries in the case since the consent decree was approved.

gender discrimination in farm program participation should be resolved in an expeditious and just manner," and provided relief in the DC district court for would-be <u>Pigford</u> claimants who had previously submitted a late-filing request and had "not previously obtained a determination on the merits of a Pigford claim . . . ." Pub. L. No. 110-246, §§ 14011-14012, 122 Stat. 1651, 2209-12.[7]  Section 14012 of the 2008 Farm Bill ("Section 14012") was designed to allow "a full determination on the merits for each <u>Pigford</u> claim previously denied that determination" based on a late-filed request. <u>Id.</u> § 14012(d), 122 Stat. at 2210.  Such previously denied <u>Pigford I</u> claimants ("<u>Pigford II</u> claimants") were given two years from the 2008 Farm Bill's enactment— i.e., until June 18, 2010—to file a claim in the DC district court. <u>Id.</u> § 14012(b), (k), 122 Stat. at 2210, 2212.  Section 14012 also prohibited foreclosures on property related to a <u>Pigford</u> claim while such claim was pending. <u>Id.</u> § 14012(h), 122 Stat. at 2211-12.  Approximately 40,000 people filed complaints in the DC district court pursuant to Section 14012 between May 2008 and June 2010. <u>Pigford II</u>, 856 F. Supp. 2d at 13.  Congress ultimately capped <u>Pigford II</u> damages at $1.25 billion in the aggregate.  Claims Resolution Act of 2010, Pub. L. No. 111-291, § 201(b), 124 Stat. 3064, 3070.

On October 27, 2011, the DC district court certified the <u>Pigford II</u> class and approved a proposed settlement agreement as "fair, adequate, and reasonable."[8]  <u>Pigford II</u>, 856 F. Supp. 2d at 22, 27.  An appeal of the class certification was dismissed.  <u>Latham</u>, 2012 WL 10236550.  The DC district court approved the distribution of settlement funds on August 23, 2013.  <u>In re Black Farmers Discrimination Litig.</u>, No. 08-mc-0511, 2013 WL 4507951 (D.D.C. Aug. 23, 2013).

### C. Carl Parker's Farm Loans

Carl Parker, who identifies himself as an African-American farmer, has resided in Ashburn, Georgia his entire life.  Compl. ¶ 1; Compl. Ex. B at 33; Compl. Ex. C at 33; Def.'s App. A57, A104, A212.  He farmed peanuts, soybeans, corn, wheat, and cotton.  Def.'s App. A64, A69.  On April 24, 1984, Carl Parker received a supervised farm operating loan of $89,000 from the Worth County Farmers Home Administration ("FmHA") office of the USDA.[9]  Def.'s

---

[7]  Congress initially enacted the 2008 Farm Bill on May 22, 2008.  <u>See</u> Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-234, 122 Stat. 923 (repealed 2008).  On June 18, 2008, Congress enacted another version of the 2008 Farm Bill, <u>see</u> Pub. L. No. 110-246, 122 Stat. at 1651, in which it repealed the initial statute, <u>see id.</u> § 4, 122 Stat. at 1664.  Sections 14011 and 14012 are identical in both versions of the 2008 Farm Bill.  <u>Compare</u> Pub. L. No. 110-234, § 14011-14012, 122 Stat. 923, 1447-50, <u>with</u> Pub. L. No. 110-246, §§ 14011-14012, 122 Stat. 1651, 2209-12.  Both parties refer and/or cite to the repealed version of the 2008 Farm Bill in their filings.  <u>See</u> Compl. ¶ 9; Def.'s Mot. to Dismiss 17.  Because the pertinent provisions are identical, the court treats such references/citations as being to the later-enacted version of the statute.

[8]  The settlement agreement included provisions for paying awards, due to the limited amount of funds that Congress had appropriated for that purpose.  <u>Pigford II</u>, 856 F. Supp. 2d at 23.

[9]  Farm operating loans may be used to "pay annual farm operating and family living

App. A64, A96.  Forty percent of the loan proceeds were released upon funding, which represented reimbursement for operating expenses that Carl Parker had charged to his credit card, machinery repair, and family living expenses. Id. at A118.  As a supervised loan, farm purchases made with the remaining loan proceeds were subject to FmHA approval. Id. at A65, A108-09, A118; accord 7 C.F.R. §§ 761.51, 761.54.  Delays in waiting for such approval led to (1) problems with planting and (2) delayed and lower crop yields. Def.'s App. A67-68, A118. Meanwhile, white farmers who were in worse financial situations than Carl Parker received unsupervised loans from the USDA. Def.'s App. A116-17, A141.

In addition to his April 24, 1984 loan, Carl Parker also received a farm operating loan on March 29, 1985, two farm operating loans on February 28, 1986, and a farm ownership loan on February 26, 1986.[10] Id. at A42, A64, A96.  The 1985 loan was alleged to be supervised, id. at A68, A108, but USDA records indicate that the loan was unsupervised because all loan proceeds were distributed at closing, id. at A128.  Both the 1984 and 1985 loans were eventually paid back in full. Id. at A42, A96-97.  The original principal amounts and interest rates of the two 1986 operating loans were (1) $53,136.84 at 7.25 percent and (2) $91,786.87 at 7.259 percent. Id. at A47, A50.  The record is unclear regarding the original principal amount of the 1986 ownership loan. Id. at A64.  All of the 1986 loans were made at "limited resource" interest rates, id. at A96-97, A123, but Carl Parker claims he was never made aware of this fact until approximately two decades later. Id. at A104; Compl. Ex. B at 33.  A limited resource interest rate "is an interest rate normally below the [USDA's] regular interest rate, which is available to applicants unable to develop a feasible plan at regular rates" while requesting loans or loan servicing. 7 C.F.R. § 761.2.  According to Carl Parker, the FmHA also failed to provide appropriate loan services in that he was not given technical assistance in completing the applications, nor was he informed of the "plethora" of alternative loan programs for which he was potentially qualified. Def.'s App. A65-66.

Carl Parker's applications for farm operating loans of $93,000 in 1987, 1988, and 1989 were denied on March 6, 1987, May 4, 1988, and April 28, 1989, respectively, due to concerns about repayment ability and cash flow. Id. at A64, A96, A119, A128-29.  Carl Parker attributes his cash flow problems during those years to circumstances beyond his control, such as drought conditions that impacted his crops. Id. at A103; Compl. Ex. B at 32.  Although he attempted to rent more land during that time, he was unsuccessful. Compl. Ex. B at 32; Def.'s App. A103, A130.  In addition, he submitted farm and home plans each year to be reworked by the FmHA county supervisor, but to no avail. Compl. Ex. B at 32; Def.'s App. A103, A131.  Throughout his interactions with the FmHA staff, Carl Parker was left with the impression that they had already determined that they would deny his loan applications. Compl. Ex. B at 32; Def.'s App. A103, A130.

---

expenses . . . ." 7 C.F.R. § 764.252(c) (2016); see 7 C.F.R. § 764.251 (listing uses for farm operating loans).

[10] Farm ownership loans may be used to acquire, enlarge, or make a down payment on a farm; make qualified capital improvements to a farm; to promote soil and water conservation and protection; and for certain financing activities. 7 C.F.R. § 764.151.

On May 24, 1989, Carl Parker rescheduled his outstanding USDA loans. Def.'s App. A42, A96. Upon rescheduling, the principal amounts of his operating loans were $60,746.69 and $110,693.08, both at 6.5 percent interest over fifteen years. Id. at A42, A46, A49. The principal amount of Carl Parker's ownership loan upon rescheduling was $168,164.01.[11] Id. at A42. However, he was not given any other assistance by the USDA. Id. at A103-04, A131; Compl. Ex. B at 32-33. Furthermore, he received no help when his home was damaged by fire in 1989. Compl. Ex. B at 33; Def.'s App. A104. Instead, the UDSA applied the insurance proceeds to his outstanding loan balance. Id. As a result, Carl Parker resorted to private funding through Gold Kist Financing to keep his farm operational until 1991.[12] Compl. Ex. B at 33; Def.'s App. A104, A131. He experienced further adversity in 1990 when his daughter, then four years old, sustained third-degree burns in another fire and was confined to a hospital in Augusta, Georgia—204 miles away from home—for six months. Compl. Ex. B at 33; Def.'s App. A104. In 1990, the FmHA offered Carl Parker "an opportunity to buy out his USDA loans at a net recovery value" after he was unable to reschedule his loans "due to [his] inability to project a positive cash flow," and he lost his appeal of that decision. Def.'s App. A96.

A January 1992 bankruptcy filing (which was dismissed in 1994) forced him out of the farming business in 1993. Id. at A69, A96; see also In re Parker Bros., a P'ship, No. 92-10055 (Bankr. M.D. Ga.) (filed by Gary and Carl Parker). In February 1998, Carl Parker filed a second bankruptcy petition to stop the USDA from foreclosing on his property. Compl. Ex. B at 33; Def.'s App. A104; see also In re Parker Bros., a P'ship, No. 98-10013 (Bankr. M.D. Ga.) (filed by Gary and Carl Parker). Melvin Bishop, president of the Black Farmers and Agriculturalists Association ("BFAA"), made several telephone calls to the USDA offices in Atlanta and Washington, DC on his behalf, and was successful in halting the foreclosure. Compl. Ex. B at 33; Def.'s App. A104.

### D. Gary Parker's Farm Loans

Gary Parker is Carl Parker's older brother. Compare Def.'s App. A150, with id. at A57. Like his brother, Gary Parker also self-identified as an African-American farmer, id. at A150, lived in Ashburn, Georgia his entire life, id. at A161, and farmed corn, peanuts, cotton, soybeans, and wheat in that community, id. at A153, A161. He also raised cattle. Id. at A153. Gary Parker's history with the USDA is very similar to that of his brother.

In July 1985, Gary Parker received a farm loan of $155,000 from the Worth County FmHA office.[13] Id. In February 1986, Gary Parker received a farm ownership loan and two

---

[11] The record before the court does not reflect the interest rate or the term of the ownership loan as rescheduled.

[12] USDA regulations make an applicant ineligible for funding if sufficient outside credit is available to meet all of the applicant's needs. Def.'s App. A131.

[13] The record refers to Gary Parker's 1985 loan as an "ownership" loan, Def.'s App. A153, but its description of having been made "to assist with Mr. Parker's operating expenses of

farm operating loans. Id. at A41, A153. The ownership loan was for $155,000, and the operating loans were for $98,370 and $66,492.16.[14] Id. at A41. According to Gary Parker, all of his loans were supervised. Id. at A156. When crops were sold, checks were made payable to both himself and the FmHA. Id. After taking these checks to the FmHA office, Gary Parker was given a check for only the amount of capital he could justify needing rather than funds independent of FmHA supervision. Id. Meanwhile, similarly situated white farmers received unsupervised loans. Id. at A159.

Gary Parker also applied for farm loans between 1987 and 1992, but those applications were continuously denied due to purported concerns about cash flow and ability to repay. Id. at A153. He lost appeals of those denials. Compl. Ex. C at 22. In 1987, like his brother, he tried to rent more land but was unsuccessful. Id. In later years, he was not given assistance in completing loan applications, Def.'s App. A153, but was simply told to hire someone to help him, id. at A154, and that he was "wasting the government's time" in applying for loans, id. at A156, because there was "no way [the FmHA was] going to let [him] keep borrowing [FmHA's] money . . . ," Compl. Ex. C 22. Like his brother, Gary Parker was led to believe that FmHA officials had already made up their minds to deny his loan applications because he was told he did not qualify before he had even applied. Id.; Def.'s App. A156-57.

Local USDA officials referred to Gary Parker as a "problem debtor." Def.'s App. A201. In addition, FmHA officials treated him the same way they treated his brother by refusing to inform him of alternative loan programs for which he may have been eligible. Compl. Ex. C at 22-23; Def.'s App. A156-57. Instead of receiving assistance, he was pressured to sell equipment or rent his peanut quota to the son of an FmHA official. Compl. Ex. C at 22-23. Gary Parker believed these actions were undertaken because FmHA officials wanted their family members to acquire his land and livestock. Id. at 23.

Gary Parker's inability to obtain loans, as well as the delay he experienced in receiving loans that were approved, affected his crop performance and resulted in lower yields. Def.'s App. A159. Like his brother, Gary Parker resorted to private funding through Gold Kist Financing to keep his farm operational. Compl. Ex. C at 23. Unlike his brother, however, he did not receive loan rescheduling. Def.'s App. A41. He applied for Preservation Loan Servicing in 1991, but was denied. Id. at A200. Gary Parker was eventually forced out of the farming business after declaring bankruptcy in January 1992. Def.'s App. A162; Compl. Ex. C at 23; see also In re Parker Bros., No. 92-10055.

In February 1998, Gary Parker filed a second bankruptcy to stop the USDA from foreclosing on his property. Compl. Ex. C at 23; see also In re Parker Bros., No. 98-10013. However, it took several phone calls on his behalf by BFAA president Melvin Bishop to stop the foreclosure sale from occurring. Compl. Ex. C at 23.

---

his farm operations," id., suggests that it was actually an operating loan. Regardless, the distinction is irrelevant to resolving the issues currently before the court.

[14] The record before the court does not reflect the interest rates or terms of these loans.

### E. Seeking Relief Under the Pigford I Consent Decree

Carl Parker and Gary Parker both timely submitted claim packages to the Pigford I claims facilitator on October 12, 1999. Def.'s App. A56, A149. Each had lodged prior discrimination complaints against the USDA—at a USDA listening session in Tallahassee, Florida and a meeting in Albany, Georgia—that went unresolved. Id. at A63, A174. Each elected Track A treatment.[15] Id. at A58, A151. Their claim packages were supplemented on December 29, 1999, and January 18, 2000, respectively. Id. at A55, A148. On May 5, 2000, class counsel discovered that the claims facilitator had incorrectly deemed the Parkers' filings as untimely. Id. at A54, A147. As a result, Carl Parker and Gary Parker each filed late claim affidavits on August 24, 2000, and August 21, 2000, respectively, to demonstrate why their "late" filings were beyond their control. Id. at A52-53, A145-46. Carl Parker was assigned claim number 22105, id. at A57, and Gary Parker was assigned claim number 22079, id. at A150.

Carl Parker's entire claim was denied by the adjudicator on June 16, 2004, for "fail[ure] to provide substantial evidence of discrimination" because a similarly situated white farmer was also denied an operating loan at the same time as Carl Parker. Id. at A95-99. Gary Parker's claim was similarly denied in its entirety by the adjudicator on July 1, 2004, for "fail[ure] to establish by substantial evidence that he was the subject of discrimination" regarding his loans, loan restrictions, loan denials, and lack of assistance. Id. at A199-203. In denying Gary Parker's claim, the adjudicator noted Gary Parker's "precarious" financial situation and observed that white farmers were also subject to loan supervision. Id. at A201.

Pursuant to the consent decree, Carl Parker timely petitioned for monitor review of the adjudicator's decision on September 11, 2004. Id. at A102; Compl. Ex. B at 31. See generally Def.'s App. A100-05. He sent a follow-up letter to the monitor on September 26, 2006. Compl. Ex. B at 32-34. The record before the court does not include a similar petition for monitor review filed by Gary Parker. However, like his brother, he too sent a letter to the monitor on September 26, 2006. Compl. Ex. C at 22-24. Gary Parker also sent a separate letter to class counsel that same day referencing prior communications regarding the USDA's collection efforts. Id. at 20. The record before the court does not include any responses to either of Gary Parker's September 26, 2006 letters.

On August 31, 2007, the monitor directed reexamination of a portion of Carl Parker's claim. Def.'s App. A106. See generally id. at A106-38. The monitor found a "clear and manifest error" regarding Carl Parker's claim that restrictive conditions were placed on his 1984 farm operating loan because the adjudicator relied on "mistaken assumptions of fact about [Carl Parker's] financial situation in 1984" and an improper comparison. Id. at A114-18. With respect to the latter finding, the monitor explained that pursuant to the consent decree, the issue was not whether the FmHA's restrictions were proper under the regulations then in effect, but whether such restrictions were less favorable to Carl Parker than a similarly situated white farmer. Id. At

---

[15] Gary Parker's original submission did not indicate a class preference, but his claim form was later updated to select the Track A option. Def.'s App. A143-44, A151. Carl Parker later claimed that Gary Parker had intended to seek Class B treatment. See, e.g., Compl. ¶ 7; Pl.'s Resp. 7.

the same time, the monitor found no "clear and manifest error" regarding Carl Parker's claims regarding late loan funding from 1984 through 1986, restrictive loan conditions in 1985, and denial of operating loans from 1987 through 1989. Id. at A132. Accordingly, the monitor declined to order reexamination of those claims. Id.

On June 13, 2008, the adjudicator found in Carl Parker's favor regarding supervision of the 1984 operating loan (the only claim before the adjudicator upon reexamination). Id. at A139-42. The adjudicator explained that Carl Parker's financial situation was not so poor, compared to a similarly situated white farmer who received an unsupervised loan in 1984, that disparate treatment was justified. Id. at A141. Accordingly, Carl Parker was awarded a one-time $50,000 cash payment, debt relief for any farm operating loan debt incurred between January 1, 1984, and December 31, 1996, and injunctive and tax relief pursuant to the consent decree. Id. at A141-42. The USDA finance office finished implementing Carl Parker's debt relief on December 10, 2008. Id. at A38-40; see also id. at A42 (showing Carl Parker's USDA loan balances as of June 13, 2016).

### F. Subsequent Attempts to Obtain Assistance

#### 1. Loan Servicing

Gary Parker died in December 2010, and Carl Parker became the administrator of his estate. Compl. Ex. C at 14. In April 2011, Carl Parker requested primary loan servicing, but was denied on the grounds that he had already received that service. Compl. Ex. B at 11. On September 13, 2011, Carl Parker received a thirty-day notice concerning the availability of loan servicing. Id. at 11, 13-14. He timely submitted an application for loan servicing in person at the FSA office in Sylvester, Georgia on October 12, 2011.[16] Id. at 11; Compl. Ex. C at 34. His application packet was transferred to the FSA office in Dawson, Georgia the following day. Compl. Ex. B at 11; Compl. Ex. C at 34. However, on October 31, 2011, the FSA notified Carl Parker, via several notices, that it intended to accelerate the loans held by him both individually and as administrator of his brother's estate and start foreclosure proceedings. Compl. Ex. B at 11, 15-17, 19-21, 23-25; Compl. Ex. C at 5-7, 25-30. Carl Parker received these notices on November 2, 2011. Compl. Ex. B at 22, 26. Thereafter, Carl Parker filed a request for reconsideration of the acceleration, and requested copies of all the paperwork he had submitted. Id. at 12.

#### 2. USDA Office of Civil Rights

Carl Parker filed a discrimination complaint with the USDA Office of Civil Rights ("OCR") on December 28, 2011. Id. at 30; Compl. Ex. C at 19. The discrimination complaint was received by the USDA Office of Adjudication on January 9, 2012, and assigned complaint

---

[16] In 1994, agricultural credit programs of the FmHA were assigned to a new agency, the FSA. Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, § 226(b)(3), 108 Stat. 3178, 3214 (codified as amended at 7 U.S.C. § 6932(b)(3)). Among its many responsibilities, the FSA manages the farm ownership and farm operating loan programs. 7 U.S.C. § 6932(b).

number 12-5699. Compl. Ex. B at 8. On January 20, 2012, the USDA requested additional information. Id. at 8-10. In response, Carl Parker provided a letter on February 26, 2012, outlining the problems he had encountered in attempting to apply for loan servicing. Id. at 11-12. He explained that he had been told that he did not qualify for loan servicing only to be sent an application package shortly thereafter, that he had submitted an application for loan servicing but the files were nowhere to be found, that the local FSA office seemed intent on foreclosing on his property, and that there were others who had witnessed his long-time mistreatment but were unwilling to come forward because these would-be witnesses were told by FSA personnel that they would have a "good chance" to buy his property at a foreclosure sale. Id. The case was accepted for processing on March 16, 2012. Id. at 29.

The OCR's acceptance of the complaint triggered a moratorium on loan acceleration and foreclosure proceedings against the subject properties. Compl. Ex. C at 18; accord 7 U.S.C. § 1981a(b)(1) (2012). An investigator was assigned to the case on or about April 20, 2012. Compl. Ex. B at 7. Carl Parker also filed a discrimination complaint with the OCR in his capacity as administrator of his brother's estate sometime prior to July 11, 2013, prompting the FSA to temporarily transfer the loan files to its office in Moultrie, Georgia. Compl. Ex. C at 16-17. He spoke with a representative of the OCR on November 13, 2013, regarding the complaint he filed as administrator of his brother's estate. Compl. Ex. B at 29. On December 23, 2013, the two complaints filed by Carl Parker—individually and as administrator—were joined under complaint number 12-5699 because they were both based on the same facts and circumstances. Id. The case was closed on June 4, 2014, with a finding of no discrimination. Compl. Ex. C at 11. On September 25, 2014, the moratorium on loan acceleration and foreclosure proceedings ended, and the loan files were transferred back to the FSA office in Dawson, Georgia. Id. at 12.

### 3. Reconsideration of Adverse Loan Decisions

Meanwhile, on September 5, 2014, an adverse decision was rendered regarding the debts owed by the estate of Gary Parker.[17] Id. at 8. Carl Parker asked for reconsideration of that decision on October 3, 2014. Id. On October 7, 2014, Carl Parker asked for reconsideration of an adverse loan decision reached in his individual case,[18] stressing that he was unable to pay the farm loans in prior years due to reasons beyond his control. Compl. Ex. B at 6. The two reconsideration requests were consolidated, and a reconsideration meeting was held on October 20, 2014. Id. at 27; Compl. Ex. C at 10. Reconsideration was denied in both cases. Compl. Ex. B at 27; Compl. Ex. C at 10. During the October 20, 2014 meeting, Carl Parker was given documentation from the Code of Federal Regulations and FSA Handbook 3-FLP used to determine his ineligibility for the assistance sought. Compl. Ex. B at 27; Compl. Ex. C at 10. One of the reasons given for the estate's ineligibility was that it was not a legal entity. Compl. Ex. C at 14. Carl Parker asked for an application to assume the estate's loans, but was told the time frame had expired for doing so. Id. He then requested information about assuming loans, but reported never receiving it. Id. On November 12, 2014, Carl Parker reiterated his request for

---

[17] The record before the court does not reflect what relief had been sought.

[18] The record before the court does not reflect what relief had been sought.

an application to assume his deceased brother's loans, explaining that preventing him from doing so because of a time limit would be unfair in his situation. Id. Believing that the October 20, 2014 denial of reconsideration was erroneous, id. at 10; Compl. Ex. B at 27, Carl Parker requested mediation on November 18, 2014, Compl. Ex. B at 28; Compl. Ex. C at 13. The record before the court does not reflect the results of the November 18, 2014 mediation request.

### 4. USDA Office of Administrative Law Judges (February 2016)

On February 25, 2016, Carl Parker filed a complaint with the USDA Office of Administrative Law Judges ("OALJ") alleging ongoing racial discrimination and requesting an expedited hearing before an administrative law judge ("ALJ"), a temporary restraining order, and a preliminary injunction. Def.'s App. A217-20. He cited Section 741 in support of his argument that he was entitled to a "hearing on the record" before an ALJ, and noted that such a hearing never occurred. Id. at A217-18. Carl Parker also claimed that, as a prevailing Track A claimant, the FSA's failure to forgive his farm ownership loans and subsequent foreclosure efforts violated the Pigford I consent decree. Id. at A219. In addition, Carl Parker argued that termination of the foreclosure moratorium—which was in place while his complaint was pending with the OCR—is permissible only after a hearing before an ALJ or judicial review, and that the OCR "failed to answer the complaints" he filed. Id. Carl Parker noted that his brother was also denied relief under the Pigford I consent decree and that although he petitioned the monitor for reexamination, the monitor never considered his request. Id. Carl Parker further noted that in the past, the USDA and the Pigford I monitor had lost pertinent records. Id. Finally, Carl Parker asked that an ALJ order a complete review of the administrative record. Id. at A220.

An ALJ considered Carl Parker's complaint and explained, in a March 21, 2016 order, that there was no jurisdiction to grant Carl Parker's request for a hearing because (1) Section 741 imposed an October 21, 2000 deadline for requesting that the USDA review previously unresolved discrimination complaints that were originally filed before July 1, 1997, and (2) there was no evidence that Gary Parker had ever filed a complaint with the USDA pursuant to Section 741.[19] Id. at A221-23. The ALJ therefore dismissed the petition for a hearing and forwarded the matter to the OCR "for resolution pursuant to prevailing regulations." Id. at A223.

### 5. U.S. District Court Proceedings

On February 29, 2016, Carl Parker filed suit in the United States District Court for the Middle District of Georgia ("Georgia district court") alleging (1) breach of the Pigford I consent decree based on the USDA's reinstatement of his farm ownership loan despite his status as a prevailing Track A claimant, failure to provide a hearing for his brother's estate, and violation of Section 741; (2) numerous civil rights violations, including conspiracy, arising from racial discrimination; and (3) violations of Section 14012 by virtue of the USDA's having set a March 1, 2016 foreclosure sale date. Id. at A208-16. He sought an injunction against the sale of

---

[19] As described above, see supra Part I.E, Gary Parker sought judicial relief via the Pigford I litigation instead of filing a complaint with the USDA under Section 741. See generally Def.'s App. A149-62 (containing the claim package Gary Parker submitted to the Pigford I claims facilitator).

property and $8 million in damages. Id. at A215. On June 27, 2016, he filed an amended complaint seeking a formal hearing before an ALJ, reinstatement of the foreclosure moratorium, forgiveness of his farm ownership loan, and removal of any liens against his property. Def.'s App. A224-30.

In a brief filed on September 30, 2016, Carl Parker argued that he was entitled to a formal hearing before an ALJ on his civil rights complaints under 7 C.F.R. § 15f.9 and Section 14012. Pl.'s Brief 2-5, Parker v. U.S. Dep't of Agric., No. 1:16-cv-00051 (M.D. Ga.), ECF No. 21. He also asserted that he was improperly denied a hearing under 7 C.F.R. § 766.358, that his not receiving preferential treatment in future loan applications was a further breach of the Pigford I consent decree, and that the adverse denial of a loan was still within the statute of limitations. Id. at 5-7. The Georgia district court divided Carl Parker's claims into two groups: (1) claims based on alleged violations of the Pigford I consent decree and (2) claims based on ongoing racial discrimination, i.e., that "the USDA chose to violate the Pigford [I] consent decree because he is black . . . ." Order 3-4, Parker v. U.S. Dep't of Agric., No. 1:16-cv-00051 (M.D. Ga. Oct. 6, 2016), ECF No. 23. The Georgia district court transferred the first set of claims to the DC district court, noting that only the DC district court has jurisdiction to adjudicate alleged violations of the Pigford I consent decree and no court has jurisdiction to "act as an appellate court for administrative rulings related to Pigford [I] claims." Id. at 5. It also transferred the second set of claims to the DC district court in the interest of judicial economy. Id. at 5-7. After the transfer, Carl Parker voluntarily dismissed his suit. Notice, Parker v. U.S. Dep't of Agric., No. 1:16-cv-01999 (D.D.C. Jan. 3, 2017), ECF No. 34.

### 6. USDA Office of Administrative Law Judges (August 2016)

The record before the court does not reflect any further efforts by Carl Parker to appeal the March 21, 2016 dismissal of his February 25, 2016 OALJ complaint. However, Carl Parker filed another complaint with the OALJ on August 24, 2016, requesting an expedited formal hearing, temporary restraining order, and preliminary injunction. Def.'s Reply Attach. 1 at 1-5. This new complaint was identical to the February 25, 2016 OALJ complaint, except that it was submitted on Carl Parker's behalf by a representative, and included a reference to a decision by the United States Court of Appeals for the District of Columbia Circuit that explained the court's authority to enforce the Pigford I consent decree. Compare id., with Def.'s App. A217-20.

The USDA responded to the complaint on September 15, 2016. Def.'s Reply Attach. 2 at 1-3. The USDA emphasized that there was no statutory basis for a hearing before the OALJ, noting that the time period for filing a Section 741 hearing request had expired and that the Parkers' discrimination claims from 1981 to 1997 were adjudicated under the Pigford I class-action settlement. Id. at 1-2. The complaint was dismissed with prejudice six days later because the ALJ had "no authority to grant the relief requested" for the reasons stated in the agency's response. In re Parker, No. 16-0153, 2016 WL 6235789, at *1 (U.S.D.A. Sept. 21, 2016).

### 7. Current Action

Carl Parker filed the instant action on his own behalf and as administrator of the estate of Gary Parker, proceeding pro se, on February 25, 2016, Compl. 1, the same day he filed his first

complaint with the OALJ, Def.'s App. A217. In his complaint, Carl Parker asserts claims for breach of the <u>Pigford I</u> consent decree, Compl. ¶¶ 4-8, takings without just compensation in violation of the Fifth Amendment to the United States Constitution ("Constitution"), <u>id.</u> ¶ 9, violations of Section 14012, <u>id.</u> ¶¶ 9-10, violations of the "Pigford Remedies Act of 2007," <u>id.</u> ¶11, and violations of the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 7101-7109 (2012), <u>id.</u> ¶¶ 12-13. He seeks $8 million in damages. <u>Id.</u> at 6.

Carl Parker submitted a motion for partial summary judgment on March 21, 2016, and it was filed by leave of court the following day. Order, Mar. 22, 2016. Except for the first and last sentence, the motion for partial summary judgment mirrored the complaint.[20] <u>Compare</u> Pl.'s Mot. for Partial Summ. J. 1-6, <u>with</u> Compl. 1-6. The court stayed briefing on that motion, explaining that the motion would not be entertained until after defendant responded to the complaint. Order, Mar. 22, 2016.

On July 22, 2016, defendant filed a motion to dismiss the complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") and, alternatively, for failure to state a claim upon which this court can grant relief pursuant to RCFC 12(b)(6). Def.'s Mot. to Dismiss 2. Defendant argues that this court lacks jurisdiction due to the statute of limitations. <u>Id.</u> Defendant also contends that (1) neither the 2008 Farm Bill nor the "Pigford Remedies Act" confers jurisdiction over Carl Parker's claims to this court, and (2) neither the Parkers' loans nor the <u>Pigford I</u> consent decree are within the scope of the CDA. <u>Id.</u> Further, defendant asserts that Carl Parker has failed to state a plausible claim for relief based on either a breach-of-contract or a takings theory. <u>Id.</u>

In response, Carl Parker avers that violations of the <u>Pigford I</u> consent decree are reviewable, raises a fraud claim concerning Gary Parker's purported election to pursue Track A treatment instead of Track B treatment, and cites several cases for the proposition that there is a right to a hearing pursuant to Section 14012. Pl.'s Resp. 7. Carl Parker claims that he is "not asking for a review of the decision of the adjudicator or the arbitrator," but rather a "review of the monitor's decision to deny [Gary Parker's] request for review." <u>Id.</u> at 9. He also requests that, in the interest of judicial economy, the court order the OALJ to hold a formal hearing and stay proceedings in this case until such a hearing takes place.[21] <u>Id.</u> at 13. In its reply, defendant emphasizes that none of the arguments Carl Parker raises establish this court's jurisdiction over his claims, and that Carl Parker has not pled any plausible claims for relief. Def.'s Reply 1. Defendant also observes that, instead of appealing the OALJ's dismissal of his February 25, 2016 complaint, Carl Parker filed another petition with the OALJ for a hearing. <u>Id.</u> at 5 n.2. <u>See generally</u> Def.'s Reply Attach. 1; <u>supra</u> Part I.F.6.

---

[20] In addition, Carl Parker attached a timeline of events leading up to the instant action to his motion for partial summary judgment. <u>See</u> Pl.'s Mot. for Partial Summ. J. Ex. A at 1-4.

[21] One month prior, Carl Parker moved this court to order the OALJ to hold a formal hearing. <u>See generally</u> Pls.' Mot. to Review Admin. R. The court denied the motion because jurisdiction over the Parkers' claims is a prerequisite for it to order any sort of relief. Order, Aug. 23, 2016.

Defendant's motion to dismiss is fully briefed. The court considers oral argument unnecessary.

## II. DISCUSSION

### A. Standards of Review

#### 1. RCFC 12(b)(1)

In determining whether subject matter jurisdiction exists, the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). With respect to a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, that the court possesses subject matter jurisdiction. Id. The court is not limited to the pleadings in considering subject matter jurisdiction. Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014); Pucciariello v. United States, 116 Fed. Cl. 390, 400 (2014). While pro se pleadings are "held to less stringent standards than formal pleadings drafted by lawyers" and are "to be liberally construed," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (internal quotation marks omitted), the "leniency afforded to a pro se litigant with respect to mere formalities does not relieve the burden to meet jurisdictional requirements," Minehan v. United States, 75 Fed. Cl. 249, 253 (2007). If the court finds that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

#### 2. RCFC 12(b)(6)

A claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief. Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy."). To survive an RCFC 12(b)(6) motion to dismiss, a plaintiff must include in its complaint "enough facts to state a claim to relief that is plausible on its face" sufficient for the defendant to have "fair notice" of the claim and the "grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007) (internal quotation marks omitted). In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). In ruling on such a motion, the court must "accept as true all of the factual allegations contained in the complaint" and any attachments thereto. Erickson, 551 U.S. at 94 (citing Twombly, 550 U.S. at 555-56); accord RCFC 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."); Rocky Mountain Helium, LLC v. United States, 841 F.3d 1320, 1325 (Fed. Cir. 2016) (applying RCFC 10(c) and emphasizing that "a court 'must consider the complaint in its entirety, . . . in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice'" (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007))).

The issue at this stage of litigation is not the sufficiency of the United States' potential defenses or the likelihood of Carl Parker's eventual success on the merits of his claim, but simply whether Carl Parker has alleged specific facts describing a plausible claim for relief. See Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) ("The court must determine 'whether the claimant is entitled to offer evidence to support the claims,' not whether the claimant will ultimately prevail." (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974))). As a pro se litigant, Carl Parker is afforded leniency in drafting his complaint. See Matthews v. United States, 750 F.3d 1320, 1322 (Fed. Cir. 2014).

### B.  Subject Matter Jurisdiction

Whether the court possesses jurisdiction to decide the merits of a case is a "threshold matter." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). Subject matter jurisdiction cannot be waived or forfeited because it "involves a court's power to hear a case." United States v. Cotton, 535 U.S. 625, 630 (2002), quoted in Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1868). Therefore, it is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case." Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); accord K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1004-05 (Fed. Cir. 2015). Either party, or the court sua sponte, may challenge the court's subject matter jurisdiction at any time. Arbaugh, 546 U.S. at 506.

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "may not be inferred, but must be unequivocally expressed." United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003). Further, "[w]hen waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity." Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287 (1983).

The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2012); White Mountain, 537 U.S. at 472. However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 298 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

In addition, to fall within the court's jurisdiction, any claim against the United States filed in the Court of Federal Claims must be "filed within six years after such claim first accrues." 28

U.S.C. § 2501. A cause of action accrues "when all the events which fix the government's alleged liability have occurred <u>and</u> the plaintiff was or should have been aware of their existence." <u>Hopland Band of Pomo Indians v. United States</u>, 855 F.2d 1573, 1577 (Fed. Cir. 1988), <u>quoted in</u> <u>San Carlos Apache Tribe v. United States</u>, 639 F.3d 1346, 1350 (Fed. Cir. 2011). The limitations period set forth in 28 U.S.C. § 2501 is an "absolute" limit on the ability of the Court of Federal Claims to exercise jurisdiction and reach the merits of a claim. <u>John R. Sand & Gravel Co. v. United States</u>, 552 U.S. 130, 133-35 (2008).

### C. 28 U.S.C. § 1500

The Court of Federal Claims similarly does not possess jurisdiction to hear claims that are pending in another court. 28 U.S.C. § 1500; <u>United States v. Tohono O'Odham Nation</u>, 563 U.S. 307, 311 (2011); <u>Brandt v. United States</u>, 710 F.3d 1369, 1374 (Fed. Cir. 2013); <u>Res. Invs., Inc. v. United States</u>, 114 Fed. Cl. 639, 647 (2014). Whether this statutory bar to jurisdiction applies is measured at the time the complaint is filed. <u>Brandt</u>, 710 F.3d at 1379-80; <u>Res. Invs.</u>, 114 Fed. Cl. at 647; <u>Vero Tech. Support, Inc. v. United States</u>, 94 Fed. Cl. 784, 790 (2010).

> To determine whether [28 U.S.C.] § 1500 applies, a court must make two inquiries: (1) whether there is an earlier-filed "suit or process" pending in another court, and, if so, (2) whether the claims asserted in the earlier-filed case are "for or in respect to" the same claim(s) asserted in the later-filed Court of Federal Claims action. If the answer to either of these questions is negative, then the Court of Federal Claims retains jurisdiction.

<u>Brandt</u>, 710 F.3d at 1374. Two actions are "for or in respect to the same claim . . . if they are based on substantially the same operative facts, regardless of the relief sought in each suit." <u>Tohono</u>, 563 U.S. at 317.

Whether 28 U.S.C. § 1500 operates to bar this court from exercising jurisdiction in this case was not raised by the parties, but the court has the responsibility to examine all pertinent issues relevant to subject matter jurisdiction because "[c]ourts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." <u>Hertz Corp. v. Friend</u>, 559 U.S. 77, 94 (2010); <u>accord</u> <u>Gonzalez v. Thaler</u>, 132 S. Ct. 641, 658 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider <u>sua sponte</u> issues that the parties have disclaimed or have not presented."). In other words, a court may examine the issue of subject-matter jurisdiction "on its own initiative" at any point in a case. <u>Arbaugh</u>, 546 U.S. at 506; <u>see also</u> <u>Jeun v. United States</u>, 128 Fed. Cl. 203, 209-10 (2016) (collecting cases). Although § 1500 divests this court of jurisdiction when there is another action pending elsewhere based on the same operative facts, it does not prevent the exercise of jurisdiction in this case.

Carl Parker was involved in three actions in addition to the instant case: the <u>Pigford I</u> class action, the federal district court suit that was transferred from the Georgia district court to the DC district court, and the original proceedings before the OALJ. All three actions are based, at least in part, on "substantially the same operative facts," <u>Tohono</u>, 563 U.S. at 317, as the

instant case. This action was filed on February 25, 2016.

First, the Pigford I case was dismissed with prejudice when the consent decree was approved, and the subsequent appeal concluded on March 31, 2000. Pigford, 206 F.3d at 1214. Thus, Pigford I was not pending when Carl Parker filed suit in this court. Second, Carl Parker's federal district court suit was originally filed in the Georgia district court on February 29, 2016. Thus, the federal district court case was filed four days after this suit was filed. Finally, the February 2016 OALJ complaint was filed on the same day as the instant action.[22] However, the OALJ is not a "court." See 5 U.S.C. § 551(1) (2012) (distinguishing between a federal agency and federal courts); 28 U.S.C. § 610 (listing courts whose administrative functions are overseen by the Administrative Office of the United States Courts); 28 U.S.C. § 1631 (allowing courts to transfer civil actions to another court to cure jurisdictional defects, defining courts by reference to 28 U.S.C. § 610, and including a "petition for review of administrative action" in the definition of an appeal filed in court); see also Donovan v. Diplomat Envelope Corp., 587 F. Supp. 1417, 1422 (E.D.N.Y. 1984) (noting that the administrative law judge was not a "court" for collateral estoppel purposes).

Therefore, since none of the relevant cases was "pending" in another court at the time the complaint in the instant case was filed, 28 U.S.C. § 1500 does not prevent this court from exercising subject matter jurisdiction.

---

[22] Under 28 U.S.C. § 1500, the Court of Federal Claims cannot exercise jurisdiction over claims filed "simultaneously" in district court. Griffin v. United States, 590 F.3d 1291, 1293 (Fed. Cir. 2009); Taylor v. United States, 128 Fed. Cl. 635, 639-41 (2016). However, the "language and structure" of § 1500 suggest that, to the extent possible, courts make "a factual determination of the order in which two claims are filed." United Keetoowah Band of Cherokee Indians in Okla. v. United States, 86 Fed. Cl. 183, 189 (2009); accord Kaw Nation of Okla. v. United States, 103 Fed. Cl. 613, 634 (2012) (explaining that "the statutory language of section 1500 does not allow a court to disregard the respective timing of the complaints"). "No binding case law addresses the jurisdictional effect of the time of filing on complaints filed on the same day in the Court of Federal Claims and federal district court." United Keetoowah Band, 86 Fed. Cl. at 89. Thus, the Court of Federal Claims is "divided among two camps. The majority view recognizes as dispositive the sequence of the two complaints' filings. The minority view . . . adopts a per se rule that a district court complaint filed the same day is pending regardless of time of filing." Id. at 190; accord Res. Invs., 114 Fed. Cl. at 643 n.3. Nevertheless, when evidence is lacking regarding which complaint was filed first on a particular day, the Court of Federal Claims has generally held that the district court case was pending for purposes of § 1500. See, e.g., Coeur d'Alene Tribe v. United States, 102 Fed. Cl. 17, 26 (2011); Lan-Dale Co. v. United States, 85 Fed. Cl. 431, 434-35 (2009). Here, Carl Parker mailed his complaints to the Court of Federal Claims and the OALJ, and both complaints were filed on the same day. However, because another requirement of § 1500 was not satisfied, see infra, the order in which the two complaints were filed is ultimately irrelevant.

### D.  Breach-of-Contract Claim

### 1.  This Court Lacks Jurisdiction to Consider Carl Parker's Claim for Breach of the Pigford I Consent Decree

When Carl Parker partially succeeded on his Track A claim pursuant to the Pigford I consent decree, he was awarded $50,000, tax relief, injunctive relief, and forgiveness of his outstanding farm operating loans. However, his farm ownership loan was not forgiven. Carl Parker strenuously asserts that the USDA's failure to forgive his farm ownership loan is a breach of the Pigford I consent decree because he was a prevailing claimant thereunder. He also asserts that the USDA's failure to provide Gary Parker with an administrative hearing is a breach of the Pigford I consent decree. Defendant avers that the Court of Federal Claims lacks jurisdiction to entertain claims concerning breach of the Pigford I consent decree because of the six-year limitations period specified in 28 U.S.C. § 2501.

Carl Parker is correct in his assertion that settlement agreements, including those embodied in a consent decree, constitute contracts "within the meaning of the Tucker Act." VanDesande v. United States, 673 F.3d 1342, 1351 (Fed. Cir. 2012) (internal quotation marks omitted); accord Holmes v. United States, 657 F.3d 1303, 1312-15 (Fed. Cir. 2011) (holding that a claim for breach of a settlement agreement that contemplates money damages, or can fairly be interpreted as such, is a claim within the Court of Federal Claims' jurisdiction); Pucciariello, 116 Fed. Cl. at 402 (emphasizing that "a suit seeking money damages for the alleged breach of a settlement agreement with the government falls within [the Court of Federal Claims'] jurisdiction"); Hall v. United States, 69 Fed. Cl. 51 (2005) ("The United States Court of Federal Claims has jurisdiction over the breach of settlement agreements with the United States."); see also Pigford v. Vilsack, 961 F. Supp. 2d 82, 87 (D.D.C. 2013) (construing consent decrees as contracts for enforcement purposes). However, defendant is also correct regarding the six-year statute of limitations. It is well-established that a cause of action accrues "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." Hopland Band, 855 F.2d at 1577. In a breach-of-contract case, the "cause of action accrues when the breach occurs." Holmes, 657 F.3d at 1317 (internal quotation marks omitted).

To the extent that the USDA's failure to forgive Carl Parker's farm ownership loan was a breach of the Pigford I consent decree, such cause of action arose on August 31, 2007, when the monitor granted reexamination of Carl Parker's claim regarding the restrictive conditions placed on his 1984 farm operating loan and denied reexamination of his remaining claims. At that point, Carl Parker was (or should have been) fully aware that he would not receive forgiveness of his farm ownership loan, regardless of the disposition of the reexamination decision concerning his farm operating loan. The six-year statute of limitations imposed by 28 U.S.C. § 2501 for Carl Parker's claims for breach of the Pigford I consent decree thus expired on August 31, 2013. Therefore, this court lacks jurisdiction to entertain those claims because the complaint was not filed until February 25, 2016.

To the extent that either Gary Parker's assignment to Track A or denial of relief was a breach of the Pigford I consent decree, such cause of action arose on July 1, 2004, when his claim was denied by the adjudicator.[23] At that point, Gary Parker was aware that he would receive no relief on his Track A claim. Furthermore, Carl Parker has failed to provide sufficient evidence that Gary Parker timely petitioned the monitor for reexamination. To the extent that Gary Parker's September 26, 2006 letters to the monitor and to class counsel constitute a petition for reexamination, such petition was untimely.[24] The six-year limitations period imposed by 28 U.S.C. § 2501 for Gary Parker's claims for breach of the Pigford I consent decree thus expired on July 1, 2010. Therefore, this court lacks jurisdiction to entertain those claims because the complaint was not filed until February 25, 2016.

### 2. Assuming Jurisdiction, Carl Parker Fails to State a Plausible Claim for Relief

Alternatively, to the extent that jurisdiction to consider Carl Parker's claims based on breach of the Pigford I consent decree is proper in this court, Carl Parker fails to state a plausible claim upon which this court can grant relief. To prove a breach of contract, a plaintiff must establish "(1) a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by the breach." Century Expl. New Orleans, LLC v. United States, 110 Fed. Cl. 148, 163 (2013) (citing San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989)). Once a breach of contract is established, the burden shifts to the defendant to plead and prove affirmative defenses that excuse performance. Shell Oil Co. v. United States, 751 F.3d 1282, 1297 (Fed. Cir. 2014).

Carl Parker asserts that both he and his brother participated in the Pigford I claim process. In other words, he alleges that both he and his brother were parties to the consent decree, i.e., that there was a valid contract. Carl Parker also asserts that the USDA was required to forgive all of his farm loans and to provide Gary Parker a hearing. In other words, he alleges that the USDA was subject to a contractual duty. Further, Carl Parker contends that the USDA did not forgive his farm ownership loan and has not provided the estate of Gary Parker a hearing. In other words, he alleges breach of contractual duties. Finally, Carl Parker argues that the USDA has sought to enforce the now-overdue loans through acceleration and foreclosure. In other words, he alleges damages caused by the USDA's breach of its contractual duties.

Although Carl Parker received forgiveness of his farm operating loans, he did not prevail on his claim concerning his farm ownership loan. Under the terms of the consent decree, debt forgiveness was available only for loans "incurred under or affected by the program that formed the basis of the [successful] claim." Pigford I, 185 F.R.D. at 108; accord Def.'s App. A14 (providing for loan forgiveness for debt that was "subject of the ECOA claim(s) resolved in the

---

[23] Carl Parker states in the complaint that "Pigford Class Membership was denied" Gary Parker. Compl. ¶ 7. The court construes such "denial" as a denial of relief. Carl Parker later averred that Gary Parker was improperly given Track A treatment. Therefore, the court also construes that alleged "denial" of Pigford I "class membership" as a denial of Track B treatment.

[24] Gary Parker's deadline to petition the monitor for reexamination was October 29, 2004, 120 days after his Track A claim was denied.

class member's favor"). Farm operating loans are distinct from farm ownership loans. Compl. Ex. A at 2; 7 C.F.R. § 761.2 (defining terms). Compare 7 C.F.R. pt. 764 subpt. D (describing the farm ownership loan program), with id. subpt. G (describing the farm operating loan program). Therefore, under the facts as alleged in the complaint, the USDA met its obligation to forgive Carl Parker's farm operating loans, and had no duty to forgive Carl Parker's farm ownership loan. Because the USDA had no duty to forgive Carl Parker's farm ownership loan, its failure to forgive the loan cannot constitute a breach of the Pigford I consent decree. Similarly, the USDA had no duty to forgive Gary Parker's farm loans because he was not a successful claimant, thus its failure to do so cannot constitute a breach of the Pigford I consent decree.

Furthermore, the USDA did not breach the Pigford I consent decree by failing to provide Gary Parker a hearing. Like his brother, Gary Parker elected Track A treatment and received a denial of his claim.[25] While Track B claimants were provided a "one day mini-trial," Track A claimants were not entitled to any sort of hearing. Pigford I, 185 F.R.D. at 97 (comparing the process, burden of proof, and relief available for Track A and Track B claimants). Therefore, under the facts as alleged, the USDA had no duty to provide Gary Parker a hearing under the consent decree.

### 3.  Summary

In sum, the court lacks jurisdiction to entertain Carl Parker's claims based on breach of the Pigford I consent decree. To the extent that jurisdiction in this court is proper, Carl Parker has failed to state a plausible claim upon which this court can grant relief.

### E.  Takings Claim

In his complaint, Carl Parker also alleges a contractual takings claim. The Fifth Amendment to the Constitution prohibits the government from taking private property for public use "without just compensation." The Court of Federal Claims possesses jurisdiction to entertain Fifth Amendment takings claims. Jan's Helicopter Serv., Inc. v. FAA, 525 F.3d 1299, 1309 (Fed. Cir. 2008) ("It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction."). Furthermore, "contract rights can be the subject of a takings action." Palmyra Pac. Seafoods, LLC v. United States, 561 F.3d 1361, 1365 (Fed. Cir. 2009). Therefore, the court has jurisdiction to consider contractual takings claims.

---

[25] In his September 26, 2006 letter to the monitor following denial of his Track A claim, which the court construes as a petition for reexamination of his claim, see supra Part II.D.1, Gary Parker made no mention of improper class assignment, only that he was "shocked" that the adjudicator had determined that he did not "establish[] through substantial evidence that [he] was discriminated against," Compl. Ex. C at 22. Thus, to the extent that the USDA had a duty to ensure that Gary Parker was placed in Track B in lieu of Track A, any claim that the USDA breached that duty would be waived.

To prevail on a takings claim, a plaintiff must "identify[] a valid property interest" under the Fifth Amendment and show a "governmental action [that] amounted to a compensable taking of that property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1212-13 (Fed. Cir. 2005); accord Hearts Bluff Game Ranch, Inc. v. United States, 669 F.3d 1326, 1329 (Fed. Cir. 2012). In a contractual takings case, a plaintiff must demonstrate that the government "altered [the plaintiff's] contractual rights in a way that affect[ed the plaintiff's] underlying property rights" or "stepped into the shoes of a contracting party so as to appropriate that party's contract rights . . . ." Palmyra Pac. Seafoods, 561 F.3d at 1369. Even government action that is "targeted" at a particular plaintiff does not constitute a taking that necessitates compensation if such action does not appropriate a "protectable property interest." Id. at 1370.

In this case, Carl Parker appears to allege that both his and Gary Parker's contractual rights as Pigford I claimants and as mortgagees have been usurped by the USDA due to the USDA's failure to forgive their farm loans. The court assumes, without deciding, that the Parkers' contractual rights as claimants and mortgagees have been effectively taken by the USDA. As explained above, see supra Part II.D.1, the decision not to forgive Carl Parker's farm ownership loan was made on August 31, 2007, and the decision not to forgive Gary Parker's farm loans was made on July 1, 2004. Since "a claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs," Ingrum v. United States, 560 F.3d 1311, 1314 (Fed. Cir. 2009), both claims are well beyond the six-year limitations period set forth in 28 U.S.C. § 2501.

Moreover, even if the court possessed jurisdiction to consider his takings claims, Carl Parker has failed to establish a plausible claim for relief. To prevail on a takings claim under the Tucker Act, a plaintiff must concede the legitimacy of the government action that effected the taking. Hearts Bluff, 669 F.3d at 1332 (citing Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993)); Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352 (Fed. Cir. 2001) ("[I]n a takings case we assume that the underlying governmental action was lawful, and we decide only whether the governmental action in question constituted a taking for which compensation must be paid."); accord Reg'l Rail Reorg. Act Cases, 419 U.S. 102, 126-27 & n.16 (1974) ("[T]he Government action must be authorized. 'The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do some act of Congress, is not the act of the government,' and hence recovery is not available in the [Court of Federal Claims]." (quoting Hooe v. United States, 218 U.S. 322, 336 (1910))). Carl Parker does not make such a concession, but rather alleges that the USDA violated the Pigford I consent decree by failing to forgive his and Gary Parker's outstanding farm loans. See, e.g., Davis v. United States, 123 Fed. Cl. 235, 243 (2015) (differentiating between "an uncompensated taking and an unlawful government action," explaining that each gives rise to a separate cause of action, and finding that the plaintiff failed to state a plausible takings claim because he had alleged improper government conduct (internal quotation marks omitted)), aff'd per curiam, 642 F. App'x. 982 (Fed. Cir. 2016) (unpublished decision).

In sum, the court lacks jurisdiction to entertain Carl Parker's claims based on a takings theory. To the extent that jurisdiction in this court is proper, Carl Parker has failed to state a plausible claim upon which this court can grant relief.

## F. Statutory Claims

The court next addresses Carl Parker's statutory claims. "A statute or regulation is money-mandating for jurisdictional purposes if it can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties it imposes." Ferreiro v. United States, 501 F.3d 1349, 1352 (Fed. Cir. 2007) (internal quotation marks omitted). Such a determination is made pursuant to a two-part test:

> First, the court determines whether any substantive law imposes specific obligations on the Government. If that condition is met, then the court proceeds to the second inquiry, "whether the relevant source of substantive law can be fairly interpreted as mandating compensation for damages sustained as a result of the breach of the duties the governing law imposes."

Samish Indian Nation v. United States, 657 F.3d 1330, 1335 (Fed. Cir. 2011) (quoting United States v. Navajo Nation, 556 U.S. 287, 290-91 (2009)). In other words, "to satisfy the jurisdictional requirements of the Tucker Act, the plaintiff must point to an independent, substantive source of law that mandates payment from the United States for the injury suffered." Johnson v. United States, 105 Fed. Cl. 85, 91 (2012); accord Samish Indian Nation, 657 F.3d at 1335-36 ("The Court of Federal Claims has jurisdiction if the substantive law at issue is 'reasonably amenable to the reading that it mandates a right of recovery in damages.'" (quoting White Mountain, 537 U.S. at 466)).

### 1. "Pigford Remedies Act of 2007" Claim

First, Carl Parker points to the "Pigford Remedies Act of 2007" as an alternative means for recovery based on the same facts and circumstances as his breach-of-contract and takings claims. However, as defendant observes, although many of its provisions were contained in the 2008 Farm Bill, the Pigford Claims Remedy Act of 2007 never became law. See S. 1989, 110th Cong. (2007); H.R. 3073, 110th Cong. (2007); S. 515, 110th Cong. (2007); H.R. 899, 110th Cong. (2007). While the legislative history of unenacted bills can be helpful in understanding subsequently enacted statutes with similar language, Bailey v. United States, 52 Fed. Cl. 105, 112 (2002), unenacted legislation cannot serve as a money-mandating "Act of Congress" sufficient to confer Tucker Act jurisdiction to the Court of Federal Claims, see 28 U.S.C. § 1491(a)(1). See also Hughs v. Shinseki, 408 F. App'x 367, 369 (Fed. Cir. 2011) (unpublished per curiam decision) (declining to treat an unenacted bill as a law). Therefore, Carl Parker cannot use the Pigford Claims Remedy Act of 2007 as a jurisdictional basis on which to advance claims in this court.

### 2. Section 14012 Claim

Carl Parker also points to Section 14012 of the 2008 Farm Bill as an alternative means for recovery based on the same facts and circumstances as his breach-of-contract, takings, and Pigford Claims Remedy Act of 2007 claims. He emphasizes that Congress intended Section 14012 to be "liberally construed," Pub. L. No. 110-246, § 14012(d), 122 Stat. at 2210, to effect

-24-

its purpose of providing a "full determination on the merits for each Pigford claim," id. He also properly observes that Section 14012 precludes acceleration or foreclosure regarding farm loans related to a Pigford claim. Id. § 14012(h), 122 Stat. at 2211-12. Carl Parker avers that the USDA's efforts to collect on his unforgiven farm ownership loan, collect on his brother's loans without a full hearing on the merits, and foreclose on property he owns both individually and as administrator of his brother's estate are in direct violation of Section 14012.

It is well established that statutes must be read in their entirety and enforced according to their terms if the statutory language is plain, which may become apparent only in context of the overall statutory scheme. King v. Burwell, 135 S. Ct. 2480, 2489 (2015). By invoking Section 14012, Carl Parker fails to recognize that subsection (b) clearly specifies that any action filed pursuant to Section 14012 must be brought in the DC district court. Pub. L. No. 110-246, § 14012(b), 122 Stat. at 2210; Pigford II, 856 F. Supp. 2d at 11; see also In re Black Farmers Discrimination Litig., 29 F. Supp. 3d 1, 5 (D.D.C. 2014) (explaining the DC district court's authority to oversee the Pigford II consent decree). Therefore, under the plain language of the statute, the Court of Federal Claims is without jurisdiction to consider claims arising under Section 14012.

Moreover, even if this court possessed jurisdiction to consider Carl Parker's Section 14012 claims, he has failed to state a plausible claim upon which this court can grant relief. Section 14012—which paved the way for the Pigford II settlement in the same way that Section 741 paved the way for the Pigford I settlement, Pigford II, 856 F. Supp. 2d at 8-9, 11-12—only applied to those individuals "who ha[d] not previously obtained a determination on the merits of a Pigford claim." Id. at 11; Pub. L. No. 110-246, § 14012(b), 122 Stat. at 2210. While they disagreed with the results, Carl Parker and Gary Parker each received a determination on the merits of his Pigford I discrimination claim. Section 14012 is thus of no use to the Parkers. It applies only to Pigford II claimants; it does not provide a second bite at the apple to Pigford I claimants who were unhappy with the results.

In sum, the court lacks jurisdiction to entertain Carl Parker's claims based on the USDA's alleged violation of Section 14012. To the extent that jurisdiction in this court is proper, Carl Parker has failed to state a plausible claim upon which this court can grant relief.

### 3. CDA Claim

In addition to alleging that the USDA breached the Pigford I consent decree, Carl Parker generally alleges a violation of the CDA. The CDA is a "money-mandating source of law sufficient to confer jurisdiction in [the Court of Federal Claims] under the Tucker Act." Kellogg Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. 168, 171 (2014); accord 28 U.S.C. § 1491(a)(2) (providing jurisdiction in the Court of Federal Claims to hear disputes arising under the CDA). The CDA, however, "applies only to express or implied government contracts for procurement of goods or services." Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1343-44 (Fed. Cir. 2008); accord 41 U.S.C. § 7102(a). In other words, nonprocurement contracts fall outside of this court's CDA jurisdiction. Procurement encompasses "all stages of the process of acquiring property or services." 41 U.S.C. § 111; see also Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1244 (Fed. Cir. 2010) (applying the definition of

"procurement" in 41 U.S.C. § 403(2), the predecessor to 41 U.S.C. § 111, to the Tucker Act). It involves the "acquisition by purchase, lease or barter, of property or services for the <u>direct benefit or use</u> of the Federal Government." <u>Wesleyan Co. v. Harvey</u>, 454 F.3d 1375, 1378 (Fed. Cir. 2006) (internal quotation marks omitted).

Besides the consent decree, the only contracts relevant to this case are the Parkers' farm loans and associated mortgages. This court has previously found that, in providing a loan commitment, the government "was neither procuring services nor receiving any direct benefit," even if the government were to receive reimbursement for "the loan, as well as the associated interest and fees." <u>Solaria Corp. v. United States</u>, 123 Fed. Cl. 105, 121 (2015). Here, the USDA did not procure services, nor did it receive a direct benefit in providing farm loans to Carl and Gary Parker. Even if the USDA were to have foreclosed on the subject properties, it would not have received a benefit or procured property because proceeds from the foreclosure sale to a third-party buyer would simply be applied to the outstanding loan balances.

In sum, the Parkers' farm loans and associated mortgages are not procurement contracts. Therefore, the court lacks jurisdiction to consider Carl Parker's CDA claim.

### G. Discrimination and Other Claims

Finally, Carl Parker alleges that the USDA failed to respond to his complaints of ongoing discrimination. However, to the extent that the USDA's treatment of the Parkers constitutes ongoing discrimination in violation of civil rights statutes, harassment, conspiracy, fraud, or breach of fiduciary duty or negligence (by virtue of the USDA's constantly losing the Parkers' files and paperwork), those claims must be pursued in district court because they are outside the reach of this court's limited Tucker Act jurisdiction.

First, only federal district courts possess jurisdiction to entertain claims under the relevant civil rights statutes. <u>Marlin v. United States</u>, 63 Fed. Cl. 475, 476 (2005). The Court of Federal Claims is not a district court. <u>Ledford v. United States</u>, 297 F.3d 1378, 1382 (Fed. Cir. 2002); <u>see also Lightfoot v. Cendant Mortg. Corp.</u>, 137 S. Ct. 553, 563 (2017) (distinguishing between the "Court of Federal Claims" and "federal district courts"). Second, claims of harassment, conspiracy, fraud, breach of fiduciary duty, and negligence sound in tort. <u>See Lawrence Battelle, Inc. v. United States</u>, 117 Fed. Cl. 579, 585 (2014) (fraud, discrimination, and negligence); <u>Sellers v. United States</u>, 110 Fed. Cl. 62, 68 (2013) (negligence); <u>Cox v. United States</u>, 105 Fed. Cl. 213, 218 (2012) (harassment, fraud, and breach of fiduciary duty); <u>Phang v. United States</u>, 87 Fed. Cl. 321, 325 (2009) (fraud); <u>Gant v. United States</u>, 63 Fed. Cl. 311, 316 (2004) (conspiracy, fraud, and negligence). This court lacks jurisdiction to entertain claims sounding in tort. 28 U.S.C. § 1491(a)(1); <u>see also U.S. Marine, Inc. v. United States</u>, 722 F.3d 1360, 1365-66 (Fed. Cir. 2013) (noting that under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671-2680, jurisdiction over tort claims against the United States lies exclusively in federal district courts).

The only exception to that rule is for a tort claim that "stems from a breach of contract" claim. <u>Awad v. United States</u>, 301 F.3d 1367, 1372 (Fed. Cir. 2002). In such a case, "the cause of action is ultimately one arising in contract, and thus is properly within the exclusive

jurisdiction of the Court of Federal Claims." Id.; accord Olin Jones Sand Co. v. United States, 225 Ct. Cl. 741, 745 (1980) ("Where . . . a claim is based on breach of contract it is properly within the jurisdiction of this court even though it also alleges that defendant engaged in tortious conduct in breaching the contract."). In Demodulation, Inc. v. United States, 103 Fed. Cl. 794, 813-14 (2012), this court observed that if it dismissed the counts alleging breach of contract, it would also "necessarily" dismiss the tortious claims arising out of those purported contracts. In other words, tortious breach-of-contract claims cannot survive if the underlying contractual claims are dismissed. See, e.g., Nesselrode v. United States, 127 Fed. Cl. 421, 430 (2016) (dismissing a fraud claim based on a breach of contract for lack of subject matter jurisdiction when the plaintiff failed to state a plausible breach-of-contract claim). As explained above, there is no breach-of-contract claim properly before this court. Therefore, there is no contractual basis for Carl Parker's tort claims.

In sum, the court lacks jurisdiction to consider Carl Parker's civil rights and tort claims.

### III. CONCLUSION

The court has considered all arguments of the parties. To the extent not discussed herein, the court finds them unpersuasive or without merit.

The Court of Federal Claims lacks jurisdiction to consider Carl Parker's claims for breach of the Pigford I consent decree, takings, violation of the "Pigford Remedies Act of 2007," violation of Section 14012, ongoing discrimination, harassment, conspiracy, fraud, breach of fiduciary duty, and negligence. To the extent that the courts are unable to provide relief for Carl Parker, he must seek redress from the political branches of government. See Res. Invs., 114 Fed. Cl. at 655.

In sum, the court **GRANTS** defendant's motion to dismiss the complaint for lack of subject matter jurisdiction. The court also **DENIES AS MOOT** defendant's motion to dismiss the complaint for failure to state a claim upon which this court can grant relief. Further, the court **DENIES AS MOOT** Carl Parker's motion for partial summary judgment.

The court has filed this ruling under seal. The parties shall confer to determine agreed-to proposed redactions. Then, by **no later than Tuesday, February 28, 2017**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

No costs. The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

MARGARET M. SWEENEY
Judge